IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF
PENNSYLVANIA, DEPARTMENT
OF ENVIRONMENTAL
PROTECTION,

       Plaintiff

       v.

LOCKHEED MARTIN
CORPORATION,

       Defendant

:
:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL NO. 1:09-CV-0821

JUDGE SYLVIA H. RAMBO

# M E M O R A N D U M

      The Commonwealth of Pennsylvania, Department of Environmental

Protection, ("PADEP"), brought this action for the recovery of response costs

incurred in the cleanup of Strontium-90, ("Sr-90"), a radioactive and hazardous

nuclear byproduct material, at or from the Quehanna Wild Area Nuclear Site in the

Quehanna Wild Area of the Moshannon State Forest in Clearfield County,

Pennsylvania, ("site").  Defendant Lockheed Martin Corporation's, ("LMC"),

predecessor, the Martin-Marietta Corporation, was the last known user of Sr-90 at

the site.[1]

      PADEP's cost recovery claims arise from Section 107(a) of the

Comprehensive Environmental Response, Compensation, and Liability Act of 1980,

as amended 42 U.S.C. §§ 9601-9675, ("CERCLA"), and certain environmental

statutes and common law of the Commonwealth of Pennsylvania, including the

Hazardous Sites Cleanup Act, ("HSCA"), 35 P.S. §§ 6020.101-6020.1305; the Solid

---

[1]Both parties make no distinction between the actions of LMC and its predecessor Martin-
Marietta Corporation.  Accordingly, the court will refer to both entities simply as LMC.

Waste Management Act, ("SWMA"), 35 P.S. §§ 6018.101-6018.1003; the Clean

Streams Law, ("CSL"), 35 P.S. §§ 691.1-691.1001; and Section 1917-A of the

Administrative Code of 1929, 71 P.S. § 510-17.  LMC has brought a motion to

dismiss PADEP's Amended Complaint in its entirety.

I.        **Background**

    A.        **Facts**

The following facts are taken from PADEP's Amended Complaint and

matters of public record which are judicially noticeable.  Specifically, the court takes

judicial notice of certain facts and background information appearing in the Federal

Register.[2]  For the purposes of deciding LMC's motion to dismiss, all of the facts are

taken as true, and have been construed in the light most favorable to PADEP.

    1.  **Quehanna Wild Area Nuclear Site**

The Quehanna Wild Area Nuclear Site is located near Karthus,

Clearfield County, Pennsylvania, in the Quehanna Wild Area of the Moshannon

State Forest, and is approximately seven acres in size, heavily wooded, and sparsely

populated.  *See* Nuclear Regulatory Commission Notice, 71 Fed. Reg. 59,839-40

(Oct. 11, 2006) ("Commission Notice").  The site contains one large building,

several smaller buildings, asphalt parking lots and driveways, a septic system leach

field used for sanitary sewer waste, and an approximately one acre pond.  *Id.*  The

main building was constructed to house a pool reactor and associated laboratories,

---

[2]The contents of the Federal Register are judicially noticeable by statute, *see* 44 U.S.C. § 1507, and the court may take judicial notice of public records such as those filed by federal agencies. *See e.g.*, *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (taking judicial notice of information contained in public Securities and Exchange Commission filings).

hot cells, and offices.  Auxiliary buildings included a waste water treatment building, associated underground tanks, piping, and a water storage building.  *Id.*

The site was constructed in 1957 after the Commonwealth of Pennsylvania enacted legislation for the location of a research facility that was to be operated by the Curtiss-Wright Corporation.  *Id.*  In 1958, the Atomic Energy Commission[3] issued a license to Curtiss-Wright to operate a pool reactor at the facility; the license included use of the hot cells and laboratories.  *Id.*  In 1960, Curtiss-Wright donated the facilities to the Pennsylvania State University, ("Penn State"), which planned to use the reactor for training and research; Penn State leased the hot cells to LMC.  *Id.*

There were six hot cells in the main building on the site.  (Doc. 3, Amend. Compl. ¶ 6.)  The hot cells were large steel-lined, high-density concrete rooms that provided shielded work areas for high activity radiation work including encapsulation and irradiation.  (*Id.*)  From 1962 through 1967, LMC used the hot cells to manufacture thermoelectric generators known as SNAP generators.  Commission Notice, 71 Fed. Reg. at 59,840.  The SNAP generators contained Sr-90, a radioactive isotope that constitutes "byproduct material" within the meaning of the Atomic Energy Act ("AEA").  *Id.*  At all times, LMC possessed and used Sr-90 pursuant to a Byproduct Material License No. 19-1398-29 issued by the

---

[3]The Atomic Energy Commission ("AEC") is the predecessor agency to the Nuclear Regulatory Commission ("NRC").  "In 1974, Congress abolished the AEC and reassigned its responsibilities for licensing and regulation under the [Atomic Energy Act] to the NRC, and its oversight of government nuclear research facilities to the Department of Energy."  *Gilbert v. Stepan Co.*, 24 F. Supp. 2d 325, 336 n.11 (D.N.J. 1998); *see also* The Energy Reorganization Act of 1974, 42 U.S.C. § 5801 *et seq.*  At all times, the relevant agency in charge of licensing and regulating the activities which occurred at the site was either the AEC or the NRC.  The parties have chosen to refer to these agencies collectively as the Commission and the court will do likewise throughout this memorandum.

Commission.  Atomic Energy Commission, Notice of Issuance of Byproduct
Material License, 27 Fed. Reg. 6341 (July 3, 1962); Notice of Proposed Issuance of
Byproduct Material License, 27 Fed. Reg. 5518 (June 6, 1962).

In 1967, LMC terminated its lease for use of the hot cells after
performing partial decontamination.  Commission Notice, 71 Fed. Reg. at 59,840.
However, "licensable quantities of Sr-90 contamination remained in the hot cells
and associated facilities." *Id.*  These quantities of Sr-90 were left in the hot cells,
piping, and tanks in the main building at the site.  (Doc. 3, Amend. Compl. ¶ 10.)
LMC was the last user of Sr-90 at the site.  Commission Notice, 71 Fed. Reg. at
59,840.  Also in 1967, Penn State returned the site back to the Commonwealth of
Pennsylvania, which subsequently leased it to a subsidiary of Atlantic-Richfield
Corporation, and later to other companies, all of whom worked with hazardous
substances.  PADEP took control over all operations at the site in December 2002.
*Id.*

## 2.  <u>Site Cleanup</u>

In the early 1990s, PADEP contracted with a company to perform a site
assessment which revealed that nearly all parts of the interconnected structure,
including the hot cells, Service Area, waste water treatment building, associated
drain lines, reactor bay, the inside of the walls, under floor coverings of the
administration area, and the underlying soils were contaminated with Sr-90.  (Doc.
3, Amend. Compl. ¶ 11.)

In 1998, a decommissioning plan was submitted by PADEP to the
Commission, with a revision of the plan submitted in 2003.  In May of 2005, a
survey by the Commission revealed that the site did not meet release criteria

4

approved in the 2003 decommissioning plan "because Sr-90 had leached to the surface of the concrete resulting in contamination levels in excess of the release limits."  Commission Notice, 71 Fed. Reg. at 59,840.  Specifically, this finding indicated that concrete thought to contain only surface contamination was "volumetrically contaminated."  *Id.*

Since the first decommissioning plan was submitted, PADEP has taken response actions at the site, including the removal and disposal of residual Sr-90; demolition of the site structures and monitoring; as well as sampling the site to ensure that it met release criteria for Sr-90 and other hazardous wastes.  (Doc. 3, Amend. Compl. ¶ 16.)  The decommissioning and cleanup of the site has been complete since, at the latest, June 27, 2009.  *See* 39 Pa. Bull. 3223 (June 27, 2009).  As of the filing of its original complaint, PADEP has incurred more than $20,000,000 in unreimbursed response costs related to the cleanup and removal of the Sr-90 contamination left by LMC.

### B.   Procedural History

PADEP filed its initial complaint on April 30, 2009, (Doc. 1), and an Amended Complaint on May 7, 2009, (Doc. 3).  On July 6, 2009, LMC filed its motion to dismiss and brief in support.  (Docs. 16-17.)  On August 12, 2009, PADEP filed its brief in opposition to LMC's motion.  (Doc. 23.)  On August 31, 2009, LMC filed its reply brief.  (Doc. 26.)  The motion is ripe for disposition, and for the reasons that follow it will be denied.

## II.        Legal Standard

Among other requirements, a sound complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This statement must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

In deciding a motion to dismiss under Rule 12(b)(6), the court is required to accept as true all of the factual allegations in the complaint, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and all reasonable inferences permitted by the factual allegations, *Watson v. Abington Twp.*, 478 F.3d 144, 150 (3d Cir. 2007), viewing them in the light most favorable to the plaintiff, *Kanter v. Barella*, 489 F.3d 170, 177 (3d Cir. 2007). *Phillips*, 515 F.3d 224, 233 (3d Cir. 2008). If the facts alleged are sufficient to "raise a right to relief above the speculative level" such that the plaintiff's claim is "plausible on its face," a complaint will survive a motion to dismiss. *Twombly*, 550 U.S. at 555, 570; *Phillips*, 515 F.3d at 234; *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007); *Stevenson v. Carroll*, 495 F.3d 62, 66 (3d Cir. 2007). *See Ashcroft v. Iqbal*, ___U.S.___, 129 S. Ct. 1937, 1949 (explaining a claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged"). Further, when a complaint contains well-pleaded factual allegations, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 129 S. Ct. at 1950. However, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id*. (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause

of action, supported by mere conclusory statements do not suffice." *Id*. at 1949
(citing *Twombly*, 550 U.S. at 555).

"To decide a motion to dismiss, courts generally consider only the
allegations contained in the complaint, exhibits attached to the complaint and
matters of public record." *Pension Benefit Guar. Corp. v. White Consol. Indus.,
Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted); *see also Sands v.
McCormick*, 502 F.3d 263, 268 (3d Cir. 2007).  The court may consider
"undisputedly authentic document[s] that a defendant attaches as an exhibit to a
motion to dismiss if the plaintiff's claims are based on the [attached] document[s]."
*Pension Benefit*, 998 F.2d at 1196.  Additionally, "documents whose contents are
alleged in the complaint and whose authenticity no party questions, but which are
not physically attached to the pleading, may be considered." *Pryor v. Nat'l
Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002) (citation omitted); *see
also U.S. Express Lines, Ltd. v Higgins*, 281 F.3d 383, 388 (3d Cir. 2002)
("Although a district court may not consider matters extraneous to the pleadings, a
document *integral to or explicitly relied* upon in the complaint may be considered
without converting the motion to dismiss into one for summary judgment.") (internal
quotation omitted).  However, the court may not rely on other parts of the record in
making its decision. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250,
1261 (3d Cir. 1994).

### III.      <u>Discussion</u>

In its motion to dismiss, LMC asserts that all of PADEP's claims fail to
state a claim as a matter of law.  As to PADEP's CERCLA claims, LMC makes a

two pronged attack: (1) CERCLA has no applicability to the decommissioning of the Quehanna Facility; and (2) the releases allegedly caused by LMC at the site are excluded under the plain terms of the statute.  As to PADEP's state causes of action, LMC argues that each is preempted by the Atomic Energy Act.  The court will address each of LMC's arguments in turn.

### A.   **CERCLA**

Before the court addresses the specifics of LMC's arguments, an overview of CERCLA is necessary.  In response to widespread concern over the improper disposal of hazardous wastes, Congress enacted CERCLA, "a complex piece of legislation designed to force polluters to pay for costs associated with remedying their pollution."  *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 258 (3d Cir. 1992) (citing *A Legislative History of the Comprehensive Environmental Response, Compensation and Liability Act of 1980*, Senate Comm. of Env't & Pub. Works ("*A Legislative History*"), S. Doc. No. 97-14, 97th Cong. 2d Sess. 1983, Vol. I, at 320 (one of the statute's principal goals is "assuring that those who caused chemical harm bear the costs of that harm. . . .")).

CERCLA is a remedial statute which provides for strict liability, and should be construed liberally to effectuate its goals.  *Alcan Aluminum*, 964 F.2d at 258-59; 42 U.S.C. § 9601(32).  The statute embodies a bifurcated scheme to promote the cleanup of hazardous sites, spills, and releases.  First, CERCLA grants broad authority to the executive branch to provide for the cleanup of hazardous waste sites.  *See* 42 U.S.C. §§ 9604-05, 9611-12; *Alcan Aluminum*, 964 F.2d at 258.  Second, CERCLA authorizes states and private parties to institute civil actions to recover the cost involved in the cleanup of hazardous wastes from those responsible

for their creation, and to thereby ensure, so far as possible, that those who pollute the environment are liable for the response costs associated with cleaning it up. *See* 42 U.S.C. § 9607(a)(1-4).

Under § 9607, CERCLA liability is imposed for response costs where the plaintiff establishes the following four elements: (1) the defendant is a "responsible party"; (2) the hazardous substances were disposed of at a "facility"; (3) there is a "release" or threatened release of hazardous substances into the environment; and (4) the "release" causes the incurrence of "response costs." *See id.*; *see also Alcan Aluminum*, 964 F.2d at 258-59. Of these, LMC does not contest that the site meets the definition of "facility" as that term is defined by CERCLA, or that "response costs" were incurred by PADEP; however, it does challenge whether PADEP has properly pled, or, for that matter, could ever properly plead, that the other elements are present under the facts as alleged in the Amended Complaint and matters of public record. LMC also argues that as a matter of policy, CERCLA liability is inapplicable to sites decommissioned under the authority of the NRC. The court will address this latter argument first, and will then address LMC's other grounds for dismissal.

## 1. Applicability of CERCLA to an NRC supervised decommissioning

LMC argues that PADEP's CERCLA claim fails because CERCLA has no applicability to the decommissioning of the site pursuant to the Atomic Energy Act. It is undisputed that PADEP undertook its efforts to remedy the Sr-90 contamination as a licensee of the NRC pursuant to a decommissioning plan approved by the NRC. Indeed, the Amended Complaint acknowledges that the PADEP "has been remediating the . . . Sr-90 at the site under decommissioning

plans approved by the NRC and consistent with 10 C.F.R. § 70.3811." (Doc. 3, Amend. Compl. ¶ 12.)  As LMC points out in its brief in support of its motion, this admission is confirmed by the public record concerning the cleanup of radiological hazards at the site.  *See* Commission Notice, 71 Fed. Reg. at 59,840.

LMC argues, without citation to authority, that because the clean-up was a Commission supervised decommissioning that CERCLA is inapplicable. LMC's argument finds no support in the statutory text of CERCLA or the Atomic Energy Act, and is not supported by the legislative history of either statute. CERCLA's plain language does not limit the ability to recover costs only to those costs incurred when the state acts as an environmental regulator rather than pursuant to a decommissioning plan approved by the NRC.  Instead, § 9607 broadly permits the recovery of "all costs of removal or remedial action incurred by . . . a State."  42 U.S.C. § 9607(a)(4)(A).  The only limitation on the recovery of "all costs" is that the "incurrence of response costs" must has been caused by "a release or, a threatened release . . . of a hazardous substance."  *See* 42 U.S.C. § 9607(a)(4).[4]

---

[4]  As the Third Circuit has observed, "CERCLA was passed in great haste during the waning days of the 96th Congress.  As a result, the statute is riddled with inconsistencies and redundancies." *Alcan Aluminum*, 964 F.2d at 258 n.5.  This court would add that the statute was carelessly drafted as well.  One area of apparent carelessness is section § 9607(a), which is the section of CERCLA that imposes liability for the incurrence of response costs.  That section reads, in relevant part:

Notwithstanding any other provision or rule of law, and subject only to the

defenses set forth in subsection (b) of this section--

(1) the owner and operator of a vessel or a facility,
(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another

(continued...)

Putting aside for the time being that LMC challenges whether its handling of Sr-90 at the site constituted a "release" as that term is defined by CERCLA, there is little debate that PADEP took the actions that it did to remedy the continued presence of Sr-90 at the site, or that Sr-90 is a "hazardous substance" as that term is defined in 42 U.S.C. § 9601(14).[5]  In its Amended Complaint, PADEP alleges that it "has incurred in excess of []20 million dollars in unreimbursed response costs related to the cleanup and removal of Sr-90 contamination left behind by [LMC]."  (Doc. 3, Amend. Compl. ¶ 20.)  This is a sufficient factual allegation to "plausibly give rise to an entitlement to relief." *Iqbal*, 129 S. Ct. at 1950.

---

[4](...continued)
party or entity and containing such hazardous substances, and
(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, *from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance*, shall be liable for--
> (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;
> (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;
> (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and
> (D) the costs of any health assessment or health effects study carried out under section [9604(I)].

42 U.S.C. § 9607(a) (emphasis added).  As courts have observed, including the Third Circuit, Congress intended the italicized language to relate not only to § 9607(a)(4), but also to § 9607(a)(1-3), but apparently grossly misdrafted the language.  *Alcan Aluminum*, 964 F.2d at 257 n.4; *Dedham Water Co. v. Cumberland Farms Dairy Inc.,* 889 F.2d 1146, 1151 n.4 (1st Cir. 1989); *N.Y. v. Shore Realty Corp.,* 759 F.2d 1032, 1043 n.16 (2d Cir. 1985).

[5] The court discusses in Part III.A.2., *infra*, how it reached the conclusion that Sr-90 was a "hazardous substance" as defined by CERCLA, and the ambiguity that this conclusion creates within the statute when contrasted with the fact that CERCLA appears to exclude the possibility that one could ever "dispose" of Sr-90 within the meaning of CERCLA.

For its part, LMC argues that the legislative history "confirms that CERCLA was intended to be applicable *only* to those radiological 'waste sites [that] do not otherwise come within section 170 of the Atomic Energy Act.'" (Doc. 17, Br. in Supp. of Mot. to Dismiss, at 7 (emphasis and alterations in original) (citing *A Legislative History* at 715)).[6]  At first blush, the passage cited by LMC appears to support its position that CERCLA was not meant to apply to waste sites regulated by the NRC under the Atomic Energy Act, but a fuller examination of that passage results in a different conclusion.  Unedited, and in context, the passage cited by LMC reads as follows:

> Mr. HART.
> As you know, Colorado and several other Western States have serious problems with wastes at radium sites that have been abandoned by companies whose radium mining, milling, and processing activities produced the wastes. These sites are dangerous because they are not properly controlled or regulated and emit low-level radiation. We have found many radium waste sites scattered across Colorado--under restaurants, in empty lots where children play, near factories, and elsewhere. These sites need to be cleaned up to protect the health and safety of Colorado citizens. My question is this: Does the term "hazardous substance," as defined in section 101(14) of this bill, include the wastes at these radium sites?
>
> Mr. STAFFORD.
> I will gladly assure the Senator from Colorado that if the radium *waste sites do not otherwise come within section 170 of the Atomic Energy Act*, and are not specified in the Uranium Mill Tailings Act, they will be eligible for funding and remedial action, subject to the other conditions of this bill.

---

[6] LMC's citation to the legislative history was actually to a source reproduced by Arnold and Porter which is differently paginated than the official report cited to by the court.  (*See* Doc. 17 at 7). For the sake of consistency throughout this memorandum, the court will cite to the Committee Print as fully cited on page 8 in this memorandum.

> Mr. HART.
> I appreciate the assurances of the Senator from Vermont. I applaud his efforts in getting this legislation enacted and feel confident that it will go a long way toward removing a serious health and safety problem that has plagued Colorado and other States in which the mining, milling, and processing of radium have occurred.

*A Legislative History*, at 715 (emphasis added).

Furthermore, the very definition of "hazardous substance" that Senator Hart inquired about includes, by reference to § 102 (42 U.S.C. § 9602) of CERCLA, a list of substances, including Sr-90, that have been specifically designated by the Environmental Protection Agency as coming within the meaning of the term "hazardous substance." *See* 42 U.S.C. § 9601(14). Furthermore, it is clear that the back-and-forth between Senators Hart and Stafford was designed to reassure Senator Hart that certain radiological waste *would be covered by CERCLA* rather than excluded from coverage. Thus, the court concludes that the legislative history cited by LMC does not advance its argument that CERCLA is inapplicable to NRC decommissioned sites.[7] Accordingly, the court concludes that CERCLA cost recovery actions are permitted for the clean-up of NRC decommissioned sites so

---

[7]LMC also points to a Memorandum of Understanding (MOU) between the Environmental Protection Agency ("EPA") and the NRC which states that the EPA will defer exercise of authority under CERCLA for the majority of facilities under NRC authority. *See* Memorandum of Understanding between EPA and NRC, 67 Fed. Reg. 65,375 (Oct. 24, 2002). This MOU, by its plain terms, is designed so as to minimize the risk of overlapping regulation for NRC commissioned sites and to "[e]stablish a stable and predictable regulatory environment with respect to EPA's CERCLA authority in, and NRC's decommissioning of, contaminated sites." *Id.* at 65376. The MOU is silent about the cost recovery aspects of CERCLA, and does not limit (or expand) the scope of those actions—like this one—which are brought pursuant to § 9607(a). Put simply, there is nothing in the MOU that leads the court to conclude that Congress intended CERCLA's cost recovery provisions to be inapplicable to sites decommissioned under the authority of the NRC. Moreover, as the MOU itself acknowledges, "[s]tates are not signatories to this MOU. . . ." *Id.* at 65,377.

long as the actions otherwise meet the requirements for cost recovery imposed by

CERCLA.  It is to those other requirements that the court will now turn.

### 2.  Whether Sr-90 is excluded from the definition of "disposal" pursuant to 42 U.S.C. § 9601(29).

PADEP asserts in its Amended Complaint that LMC is a responsible

party under CERCLA and liable for the response costs associated with the

remediation of Sr-90 contamination because it was the last user of Sr-90 at the site,

it left behind Sr-90 at the site, and PADEP incurred response costs to remove Sr-90

from the site.  (Doc. 3, Amend. Compl. ¶¶ 9-11, 19-20.)  In contrast, LMC argues

that PADEP has not alleged, nor could it, that LMC ever operated the facility at the

time of a "disposal of any hazardous substance."  42 U.S.C. § 9607(a)(2).  The key

to LMC's argument lies in the definition of "disposal," which excludes byproduct

materials licensed by the NRC, such as Sr-90.  Of course, if the definition were only

that simple the court's job would be blessedly less complicated; however, to reach

the conclusion that "disposal" excludes byproduct material like Sr-90, the court is

required to navigate a labyrinth no less complex than if it were constructed by

Daedalus[8] himself.

CERCLA defines "disposal" by reference to the definition of the same

word in the Solid Waste Disposal Act ("SWDA") at 42 U.S.C. § 6903(3).  *See* 42

U.S.C. § 9601(29)("The term[] 'disposal' . . . shall have the meaning provided in [42

U.S.C. § 6903(3)].").  The SWDA defines "disposal" as:

> The term "disposal" means the discharge, deposit,
> injection, dumping, spilling, leaking, or placing of any
> *solid waste or hazardous waste* into or on any land or

---

[8]In Greek mythology, Daedalus was an Athenian inventor who built that labyrinth of Minos to house the Minotaur; Daedalus built the labyrinth so well that he nearly could not escape.

> water so that such solid waste or hazardous waste or any
> constituent thereof may enter the environment or be
> emitted into the air or discharged into any waters,
> including ground waters.

42 U.S.C. § 6903(3) (emphasis added).  This definition requires that one can only "dispose" of that which is "solid waste" or "hazardous waste."  The definition of "hazardous waste" is of little value, because it too incorporates the definition of "solid waste."  *See* 42 U.S.C. § 6903(5) (The term "'hazardous waste' means a *solid waste, or combination of solid wastes*, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may. . . ." (emphasis added)).  Thus, the court must look to the definition of "solid waste," which is as follows:

> [A]ny garbage, refuse, sludge from a waste treatment plant,
> water supply treatment plant, or air pollution control
> facility and other discarded material, including solid,
> liquid, semisolid, or contained gaseous material resulting
> from industrial, commercial, mining, and agricultural
> operations, and from community activities, **but does not
> include** . . . source, special nuclear, or **byproduct
> material as defined by the Atomic Energy Act of 1954**,
> as amended (68 Stat. 923) [42 U.S.C.A. § 2011 *et seq*.].

42 U.S.C. § 6903(27) (emphasis added).  There is no disagreement that Sr-90 is a "byproduct material" as defined by the AEA, and the public record supports this conclusion.  *See* Notice of Proposed Issuance of Byproduct Material License, 27 Fed. Reg. 5518 (June 8, 1962).  Thus, concludes LMC, because the term "disposal" as used by CERCLA excludes Sr-90 because it is a byproduct material, it is statutorily impossible for LMC to have operated the site at the time of a "disposal of any hazardous substance"—because no "disposal" of Sr-90 can ever occur—and, therefore, LMC cannot be liable for the response costs incurred in the clean-up of Sr-90.  LMC's logic is correct, but it is not the end of the line.

15

In its brief in opposition to LMC's motion, PADEP correctly points out that the phrase "hazardous substance" is itself a term of art defined by CERCLA, and it just so happened to specifically *include* Sr-90 in its definition. CERCLA defines "hazardous substance" to include, among other things, "any element, compound, mixture, solution, or substance, designated pursuant to Section 102" of CERCLA.  42 U.S.C. § 9601(14).  Pursuant to Section 102 of CERCLA—42 U.S.C. § 9602(a)—the EPA Administrator has designated a number of "hazardous substances" at 40 C.F.R. § 302.4(a), which states "[t]he elements and compounds and hazardous wastes appearing in Table 302.4 are designated as hazardous substances under Section 102(a)" of CERCLA.  Sr-90 is listed in that table. *See* 40 C.F.R. Tbl. 302.4, App. B.

Thus, when reconciled, the language of the liability provisions of § 9607(a) is ambiguous because the "disposal of any hazardous substance" both *excludes* and *includes* Sr-90.  One could reasonably interpret this language to make "disposal" the operative word, and because it excludes Sr-90 any handling of that substance would not give rise to CERCLA liability.  On the other hand, one could determine that "hazardous substance" is the operative language because the main purpose of CERCLA is to make polluters pay for response costs, and since that phrase includes Sr-90, PADEP is not precluded from continuing its claim.  Of course, it would be impermissible for the court to read either the term "disposal" or the term "hazardous substance" out of § 9607(a)(2).  *See Hawaii v. Office of Hawaiian Affairs,* ____ U.S. _____, 129 S. Ct. 1439, 1444 (2009) ("'We must have regard to all the words used by Congress, and as far as possible give effect to them.'" (quoting *Louisville & Nashville R.R. Co. v. Mottley*, 219 U.S. 467, 475

(1911)); *see also Hibbs v. Winn,* 542 U.S. 88, 101 (2004) ("[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant ...." (internal quotations omitted)).

Of course, the maxim of giving all words of a statute their due weight is fine when a statutory phrase does not lend itself to two different conclusions, as is the case here.  Nevertheless, the absence of textual clarity does not lead to judicial despair; instead, the court is charged with determining what Congress meant by the apparent ambiguity in the statutory language.  *See Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, ___ U.S. ___, 128 S. Ct. 2326, 2342 (2008) (Breyer, J., dissenting) ("Statutory interpretation is not a game of blind man's bluff.  Judges are free to consider statutory language in light of a statute's basic purposes." (citing *Dole Food Co. v. Patrickson*, 538 U.S. 468, 484 (2003) (Breyer, J., concurring in part and dissenting in part))); *see also Robinson v. Shell Oil Co.,* 519 U.S. 337, 346 (1997) (the Supreme Court's construction of a statute's meaning based in part on its consideration of the statute's "*primary purpose*" (emphasis added)).

Thus, because a literal reading of CERCLA produces absurd results, the relevant inquiry is what Congress could have meant by including the definition of "disposal" that it did, and at the same time granting the Administrator of the EPA free reign to list certain substances as "hazardous substances" subject to CERCLA liability.  The court begins with the premise that CERCLA is a remedial statue which should be construed liberally to effectuate its goals. *U.S.  v. Alcan Aluminum*, 964 F.2d 252, 258 (3d Cir. 1992).  Most significantly, in CERCLA, Congress enacted "a complex piece of legislation designed to force polluters to pay for costs associated with remedying their pollution." *Id.*  (citing *A Legislative History* at 320

(one of the statute's principal goals is "assuring that those who caused chemical harm bear the costs of that harm. . . .")).  It would seem inconsistent with this plainly stated, broad remedial purpose to totally preclude a cost recovery action for the disposal of Sr-90.

While it is true that the ambiguity in the statute is the result of a conflict created by a congressionally defined term—disposal—and an administratively defined term—hazardous substance—in the context of the entire statutory framework of CERCLA, the court finds this distinction immaterial.  There is no way to unambiguously determine what Congress meant by the phrase "disposal of any hazardous substance" without reference to the definitions of both "disposal" and "hazardous substance."  The fact that Congress chose to give the EPA discretion to define specifically what substances constitute "hazardous substances," means that this court can appropriately infer an implicit congressional delegation of interpretative authority of CERCLA to the EPA.  *See Comite Pro Rescate De La Salud v. P.R. Aqueduct and Sewer Auth.*, 888 F.2d 180, 186 (1st Cir 1989) (holding that ambiguity within the definitional section of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 —whose definitions were incorporated by CERCLA—as well as the fact that the RCRA was part of the overall complex environmental regulatory scheme, means that the court should defer to the EPA's application of the definitional section because the "agency is often in a better position than a court to offer a proper answer" as to the scope and construction of the statute).

Here, the EPA, pursuant to the regulatory power granted by § 102 of CERCLA—42 U.S.C. § 9602—has listed over 750 radionuclides as "hazardous

substances" for purposes of CERCLA.  *See* 40 C.F.R. Tbl. 302.4, App. B.  Many of

these radionuclides undoubtedly fall within definitions of "source, special nuclear,

or byproduct material as defined by the Atomic Energy Act of 1954, as amended (68

Stat. 923) [42 U.S.C.A. § 2011 *et seq*.]" that are specifically excluded under the

definition of "disposal" in CERCLA.  Certainly, when creating Appendix B to §

302.4, the Administrator of the EPA was aware of the exclusion referenced by LMC

but nonetheless included Sr-90—and 750 other radionuclides—on the list of

hazardous substances to be subject to CERCLA liability.  For purposes of resolving

the ambiguity in § 9607(a)(2) of CERCLA, the court will defer to the expertise of

the EPA in its interpretation of the definitional section, as the EPA "has, or will

develop, the type of experience that will permit it properly to [apply]" the statute.

*Comite Pro Rescate De La Salud*, 888 F.2d at 186.  After all, "the proper application

of the definitional exception[s] raises the very sort of interstitial legal question,

related to proper administration of a complex statutory scheme, to which an agency

is often in a better position than a court to offer a proper answer."  *Id.*  Accordingly,

the court concludes that disposal of Sr-90 can indeed constitute a "disposal of any

hazardous substance" for purposes of CERCLA liability pursuant to 42 U.S.C. §

9607(a)(2).

### 3.   Whether PADEP has alleged a "disposal" within the meaning of CERCLA

LMC argues that even if Sr-90 could be subject to "disposal" for

purposes of CERCLA liability, PADEP has not alleged sufficient facts to plausibly

state the LMC disposed of Sr-90 at the site.  According to CERCLA, the actions that

constitute "disposal" include "the discharge, deposit, injection, dumping, spilling,

leaking, or placing of any solid waste or hazardous waste into or on any land or

water. . . ." 42 U.S.C. §§ 9601(29), 6903(3).  In its brief, LMC cites to Paragraph 10 of PADEP's Amended Complaint, where PADEP states that "[LMC] . . . left behind and failed to dispose properly of some of the Sr-90 in the hot cells, piping and tanks after its ceased operations at the site."  (Doc. 3, Amend. Compl. ¶ 10.)  LMC argues that this allegation is insufficient to state a cause of action under the statutory definition of disposal.  (*See* Doc. 17, Br. in Supp. of Mot. to Dismiss at 12.) Inexplicably, LMC fails to point out that PADEP also alleges the following, in Paragraph 11:

> During the assessment, remediation and decommissioning, Sr-90 contamination was found in nearly all parts of the interconnected structure, including the hot cells, Service Area, waste water treatment building and associated drain lines, reactor bay, the inside of walls, under floor coverings of the administrative area, and in the underlying soils.

(Doc. 3, Amend. Compl. ¶ 11.)  These allegations are sufficient because they plausibly assert that Sr-90 was found in places that it was not supposed to be, and that LMC was the party responsible for allowing this to happen.  As long as the facts alleged are sufficient to "raise a right to relief above the speculative level" such that the plaintiff's claim is "plausible on its face," a complaint will survive a motion to dismiss. *Twombly*, 550 U.S. at 555, 570.  *See also, Ashcroft v. Iqbal*, ___U.S.___, 129 S. Ct. 1937, 1949 (explaining a claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").  Moreover, the public record lends further support to the plausibility of PADEP's factual allegations, as the NRC itself stated that "[LMC] was the last user of Sr-90 at the [site]," and that "Sr-90 had leached to the surface of the concrete resulting in contamination levels in excess of

20

the release limits," which "indicated that concrete thought to contain only surface contamination was volumetrically contaminated." *See* Commission Notice, 71 Fed. Reg. at 59,840.

Notwithstanding the facial plausibility of PADEP's allegations, LMC argues that because it performed a partial decontamination pursuant to Commission guidelines in 1967 when it ended its work at the site, and because the license for residual Sr-90 contamination was assumed by Penn State, it could not have disposed of Sr-90 within the meaning of CERCLA.  In effect, LMC's argument is nothing more than that which it made previously: Because it possessed Sr-90 with the permission of the NRC, and transferred ownership of any residual Sr-90 through the Commission regulated licensure process, that it cannot be liable for any disposal of Sr-90 because no disposal occurred until the time of the NRC approved decommissioning performed by PADEP.

The court is highly skeptical that LMC's argument has any merit. Assuming that PADEP can demonstrate at trial that the disposal of Sr-90 occurred while LMC operated the site, unless other exceptions apply, it seems irrelevant that the site was licensed by the NRC at the time of the disposal.  Certainly, LMC would have a hard time arguing that the NRC approved the leaching of Sr-90 into all of the interconnected structures at the site.  The fact that other operators were "licensed" to possess the residual Sr-90 after LMC left the site is more a function of the fact that someone must be responsible for byproduct material present on the site, than an exculpatory blessing by the NRC absolving LMC of any and all liability under CERCLA or any other federal statute.  The cases cited by LMC in support of its proposition are not analogous to the present situation.

21

Both *Prudential Ins. Co. v. U.S. Gypsum*, 711 F.Supp. 1244 (D.N.J. 1989), and *3350 Stevens Creek Assocs. v. Barclays Bank*, 915 F.2d 1355 (9th Cir. 1990) address whether a CERCLA claim can be predicated on the use of asbestos-containing materials in the construction and maintenance of building structures. Both courts held that no cause of action exists under those circumstances because a "disposal" does not occur when a hazardous substance is used as intended in a building structure.  *See Prudential, supra,* at 1254-55, and *3350 Stevens Creek Assocs., supra*, at 1360-62.  It would be one thing if PADEP had alleged, and the public record supported, the premise that the Sr-90 used by LMC had "stayed put" and had not contaminated the entire interconnected structure.  However, this is not the case, and unlike the structures in either *Prudential* or *3350 Stevens Creek Assocs.*, both PADEP's allegations and the public record indicate that the entire structure became contaminated.  Thus, it is difficult for the court to see how either of the cases cited by LMC are analogous.

At this stage of the proceedings, the court concludes that PADEP adequately alleged that LMC disposed of Sr-90 during its operation of the site.  (*See* Doc. 3, Amend. Comp. ¶¶ 9-11.)  This is all that is required to survive a motion to dismiss.  *Twombly*, 550 U.S. at 570 (stating that as long as the facts alleged are sufficient to "raise a right to relief above the speculative level" such that the plaintiff's claim is "plausible on its face," a complaint will survive a motion to dismiss).  Accordingly, the court will move on to address LMC's remaining arguments.

### 4.  **"Financial Protection" and "Release"**

Liability attaches under CERCLA only where there is "a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance." 42 U.S.C. § 9607(a)(4).[9]  LMC's second line of attack concerns the definition of "release" contained in this section, which reads, in relevant part:

> The term "release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant), **but excludes** . . . (C) release of source, byproduct, or special nuclear material from a **nuclear incident**, as those terms are defined in the Atomic Energy Act of 1954 [42 U.S.C. §§ 2011 et seq.], **if such release is subject to requirements with respect to financial protection established by the Nuclear Regulatory Commission under section 170 of such Act**. . . .

42 U.S.C. § 9601(22)(emphasis added).  This definition makes it clear that to be statutorily excluded from "releasing" a hazardous substance—and thereby, be exempt from CERCLA liability—the release must be (1) from a "nuclear incident," and (2) "subject to requirements of financial protection" under the AEA.  LMC argues that its handling of Sr-90 meets both of these requirements.

First, LMC argues that the presence of residual Sr-90 contamination alleged by PADEP falls within the AEA's definition of a "nuclear incident."  As defined by the AEA, the term "nuclear incident" means:

> [A]ny occurrence . . . within the United States causing . . . bodily injury, sickness, disease, or death, or **loss of or damage to property, or loss of use of property**, arising out of or resulting from the radioactive, toxic, explosive, or

---

[9] See n.4, supra.

other hazardous properties of source, special nuclear, or byproduct material. . . .

42 U.S.C. § 2014(q)(emphasis added).  In its Amended Complaint, PADEP alleges that the release of Sr-90 caused "structural contamination" to the buildings at the site, which required those structures to be "remove[d] and dispose[d]."  (Doc. 3, Amend. Compl. ¶ 19.)  Furthermore, the public record reflects that "Sr-90 had leached to the surface of the concrete resulting in . . . volumetric[] contaminat[ion]." Commission Notice, 71 Fed. Reg. at 59,840.  These allegations are sufficient to meet the statutory definition of a "nuclear incident."  *See Pa. v. Gen. Pub. Utils. Corp.,* 710 F.2d 117, 123 (3d Cir. 1983), *superceded by statute on other grounds as recognized by In re TMI Litig. Cases Consol. II*, 940 F.2d 832, 857 (3d Cir. 1991) (holding that at that preliminary stages of litigation, a claim of even "temporary loss of use of property . . . irrespective of any causally-related permanent physical harm to property" is adequate to assert the occurrence of a nuclear incident).

LMC also contends that it meets the second requirement for the exclusion from the definition of "release," namely that the release was subject to the requirements of "financial protection established by the [NRC] under section 170 of the [AEA]."  42 U.S.C. § 9601(22).  The AEA defines "financial protection" as simply "the ability to respond in damages for public liability and to meet the costs of investigating and defending claims and settling suits for such damages."  42 U.S.C. § 2014(k).  LMC argues that the byproducts materials license issued by the Commission in 1962 included an indemnity agreement that constitutes "financial protection" for purposes of the AEA.  In support of its argument, LMC cites to the "Notice of Proposed Issuance of Byproduct Material License" reported in the Federal Register, which reads, in relevant part:

> [The site] will not be a "Production facility" as defined in section 11t of the [AEA]. . . . Therefore, the publication in the Federal Register on March 21, 1961 (26 F.R. 2376), with respect to this [site], entitled, "Notice of Interim Establishment of Required Financial Protection and Indemnification Fee" should be disregarded, and neither financial protection will be required of nor will indemnity be extended to this licensee under section 170c of the [AEA]. **However, there is Price-Anderson indemnity coverage under a contract between the Commission and [LMC] pursuant to section 170d of the [AEA].**

27 Fed. Reg. 5518 (June 6, 1962) (emphasis added).  According to LMC, the indemnity coverage provided in the contract between it and the Commission pursuant to section 170d of the AEA is "financial protection" as that term is defined by the AEA because it would permit LMC to "respond in damages for public liability and to meet the costs of investigating and defending and settling suits for such damage."  42 U.S.C. § 2014(k).  Indeed, although the term "indemnification" is not defined in the AEA, its plain meaning is consistent with the meaning ascribed by Congress to the phrase "financial protection."  *See* Black's Law Dictionary, 8th Ed. (2004) (defining "indemnification" as "the action of compensating for loss or damage sustained").  If this were the end of the statutory language, the court would be inclined to agree with LMC that its use of Sr-90 was subject to AEA "financial protection," unfortunately, the AEA is not that clear.

PADEP argues that whether the indemnity agreement between the Commission and LMC constitutes financial protection is a fact specific inquiry that is inappropriate for disposition on a motion to dismiss.  Specifically, it argues that the face of the license, by its terms, did not require financial protection, and not all indemnity agreements between the Commission and a licensee constitute financial

protection because indemnity agreements and financial protection serve two different purposes.

Concerning the first argument, the court agrees that the terms of the license clearly indicate that financial protection is not required. The Federal Register notice clearly states that "neither financial protection will be required of nor will indemnity be extended to this licensee under section 170c of the [AEA]. However, there is Price-Anderson indemnity coverage under a contract between the Commission and Martin-Marietta pursuant to section 170d of the [AEA]." 27 Fed. Reg. 5518.

PADEP's second point also has merit. Although the parties make only a passing reference to the fact that § 2210 reads differently now than it did in 1962 when the byproduct materials license was issued by the Commission, the court believes that it makes considerably more sense to look at the 1962 version of the statute when considering what the Commission meant by its reference to sections 2210(c) and (d). In 1962, section 2210 read, in relevant part:

**§ 2210. Indemnification and limitation of liability.**

**(a) Financial protection for public liability claims; indemnification agreement; waiver of immunity.**

Each license issued under section 2133 or 2134 of this title and each construction permit issued under section 2235 of this title shall, and each license issued under section 2073, 2093, or 2111 of this title may, have as a condition of the license a requirement that the licensee have and maintain financial protection of such type and in such amounts as the Commission shall require in accordance with subsection (b) of this section to cover public liability claims. Whenever such financial protection is required, it shall be a further condition of the license that the licensee execute and maintain an indemnification agreement in accordance with subsection (c) of this

section. The Commission may require, as a further condition of issuing a license, that an applicant waive any immunity from public liability conferred by Federal or State law.

**(b) Amount and types of financial protection.**

The amount of financial protection required shall be the amount of liability insurance available from private sources, except that the Commission may establish a lesser amount on the basis of criteria set forth in writing, which it may revise from time to time, taking into consideration such factors as the following: (1) the cost and terms of private insurance, (2) the type, size, and location of the licensed activity and other factors pertaining to the hazard, and (3) the nature and purpose of the licensed activity: *Provided*, That for facilities designed for producing substantial amounts of electricity and having a rated capacity of 100,000 electrical kilowatts or more, the amount of financial protection required shall be the maximum amount available from private sources. ***Such financial protection may include private insurance, private contractual indemnities, self insurance, other proof of financial responsibility, or a combination of such measures.***

**(c) Indemnification from public liability in excess of level of financial protection; aggregate indemnity.**

The Commission shall, with respect to licenses issued between August 30, 1954, and August 1, 1967, for which it requires financial protection, agree to indemnify and hold harmless the licensee and other persons indemnified, as their interest may appear, from public liability arising from nuclear incidents. which is in excess of the level of financial protection required of the licensee. The aggregate indemnity for all persons indemnified in connection with each nuclear incident shall not exceed $500,000,000 including the reasonable costs of investigating and settling claims and defending suits for damage. Such a contract of indemnification shall cover public liability arising out of or in connection with the licensed activity. With respect to any production or utilization facility for which a construction permit is issued between August 30, 1954, and August 1, 1967, the requirements of this subsection shall apply

to any license issued for such facility subsequent to August 1, 1967.

**(d) Indemnification agreements for construction or operation of production or utilization facilities, or other activities; applicability to contracts; sovereign immunity.**

In addition to any other authority ***the Commission may have, the Commission is authorized until August 1, 1967, to enter into agreements of indemnification with its contractors*** for the construction or operation of production or utilization facilities or other activities under contracts for the benefit of the United States involving activities under the risk of public liability for a substantial nuclear incident. ***In such agreements of indemnification the Commission may require its contractor to provide and maintain financial protection*** of such a type and in such amounts as the Commission shall determine to be appropriate to cover public liability arising out of or in connection with the contractual activity, and shall indemnify the persons indemnified against such claims above the amount of the financial protection required, in the amount of $500,000,-000 including the reasonable costs of investigating and settling claims and defending suits for damage in the aggregate for all persons indemnified in connection with such contract and for each nuclear incident . . . .

42 U.S.C. § 2210(a)-(d) (1964) (bold, italicized, and underlined emphasis added).[10]

It is clear from the quoted language that not all indemnity agreements constitute "financial protection" under the AEA. The notice in the Federal Register unequivocally stated that "neither financial protection will be required nor will indemnity be extended to [LMC] under [§ 2210(c)]." 27 Fed. Reg. 5518. Instead, the Commission entered into a contract for "indemnity coverage" with LMC

---

[10]   There were no material changes to § 2210 from June 1962 when the Notice of Proposed Issuance of Byproduct Material License—27 Fed. Reg. 5518—was published in the Federal Register and the 1964 version of the Atomic Energy Act quoted by the court.

pursuant to § 2210(d).  By its plain terms, that section read, at all relevant times, that "[i]n such agreements of indemnification the Commission **may** require its contractor to provide and maintain financial protection."  42 U.S.C. § 2210(d) (1964) (emphasis added).  This language paints a clear picture that while some indemnity agreements may contain financial protection guarantees, not all of them do.  Otherwise, it would be superfluous for Congress to have established two separate schemes—one for financial protection and one for indemnity.

The conclusion that indemnity and "financial protection" are not coextensive is bolstered in § 2210(b), which defines the amount and types of financial protection.  That section unequivocally discussed financial protection in terms of "liability insurance available from private sources," and states that "[s]uch financial protection may include private insurance, private contractual  indemnities, self insurance, other proof of financial  responsibility, or a combination of such measures."  42 U.S.C. § 2210(b) (1964).  Conspicuously absent from the list of types of "financial protection" is the sort of contractually provided public indemnity that is at issue in this case.

Thus, contrary to the arguments made by LMC, the court does not find that the § 2210(d) indemnity is by default financial protection as that term is otherwise used in § 2210.  Instead, this is a factual issue that is inappropriate for disposition on a motion to dismiss.  The court simply does not know whether the contract between LMC and the Commission required financial protection—a provision that the Commission could have insisted upon in the agreement pursuant to the language of § 2210(d)—and, thus, the court cannot determine at this stage whether the "release" exemption applies to the release of Sr-90 at the site.

5.   **"Federally permitted release"**

Pursuant to 42 U.S.C. § 9607(j), "[r]ecovery by any person . . . for response costs or damages resulting from a federally permitted release shall be pursuant to existing law in lieu of this section."   LMC argues that even if other "release" exemptions do not apply, the "release" of Sr-90 is nevertheless exempt from CERCLA liability because they were "federally permitted release[s]" as that term is defined by 42 U.S.C. § 9601(10)(K), which reads, in relevant part:

> The term "federally permitted release" means . . . (K) any release of source, special nuclear, or byproduct material, as those terms are defined in the Atomic Energy Act of 1954 . . . in compliance with a legally enforceable license, permit, regulation, or order issued pursuant to the Atomic Energy Act of 1954.

42 U.S.C. § 9601(10)(K).  LMC argues that the public record reflects that any Sr-90 that was left behind by LMC was done so in accordance with a Byproduct Material License issued by the Commission pursuant to the AEA, and cites to the following language contained in the Commission Notice found in the Federal Register: "In 1967, LMC terminated its lease for use of the hot cells after performing a partial decontamination.  However, licensable quantities of Sr-90 contamination remained in the hot cells and associated facilities."  Commission Notice, 71 Fed. Reg. at 59,840.  According to LMC, this notice makes clear that its "license unambiguously permitted the alleged 'releases' of Sr-90."  (Doc. 17, Br. in Supp. of Mot. to Dismiss at 16.)  The issue is not that simple.

First, it bears noting that the exception LMC invokes is an affirmative defense, thus LMC, as the party claiming the defense not only has the initial burden of proof, but also the ultimate burden of proving the applicability of the exception. *See In re Acushnet River & New Bedford Harbor: Proceedings re Alleged PCB*

*Pollution*, 722 F. Supp. 893, 901 (D. Mass. 1989); *Lincoln Properties, Ltd. v. Higgins*, 1993 WL 217429, at *22 (E.D. Cal. 1993).  Moreover, if some of the harm resulted from permitted releases, and other parts of the harm from non-permitted releases, the burden is on LMC to prove that the harm is divisible.  *See U.S. v. Iron Mountain Mines, Inc.*, 812 F. Supp. 1528, 1540-41 (E.D. Cal. 1992). *See also In re Acushnet River & New Bedford Harbor: Proceedings re Alleged PCB Pollution*, 722 F. Supp. 893 (D. Mass. 1989) (Summary judgment is not appropriate when there are issues of material fact as to whether alleged polluter could be held liable for cleanup costs, despite polluter's claim that its releases were federally permitted, in that there was evidence that some of the pollution may have come from nonpermitted discharges.); *Carson Harbor Village, Ltd. v. Unocal Corp*., 287 F. Supp. 2d 1118, 1183-84 (C.D. Cal. 2003) (noting that even if defendant establishes some releases were "federally permitted," plaintiff can recover if "non-federally permitted" releases contributed to the injury).

   Second, as argued by PADEP, the term "federally permitted release" was defined by Congress in relation to and "in compliance with a legally enforceable license." 42 U.S.C. § 9601(10)(K).  Given the explicitness and clarity of this definition, it is apparent that in order to determine whether the release of Sr-90 by LMC was "in compliance" with its license, the court must examine both the license itself and the extent of the release.  While the court is aware that the license at issue is not like a disposal license where one could easily compare how much the licensee was authorized to dispose versus how much was actually disposed; the scope of the license is relevant to determine whether LMC's handling of Sr-90 at the site was consistent with its licensed activity.  Both the Amended Complaint and the public

record reflect that Sr-90 contaminated the entire site and leached places that it was never intended to be such that some of the concrete structures at the site were "volumetrically contaminated." *See* Commission Notice, 71 Fed. Reg. at 59,840.

The fact that the Commission may have authorized LMC to leave behind some Sr-90 does not mean that it authorized the later release of that substance.  At this stage of the proceedings the court is permitted only to review PADEP's allegations, "exhibits attached to the complaint and matters of public record." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted).  While the public record in this matter is voluminous and detailed, it does not answer the ultimate question whether all of the releases of Sr-90 were "in compliance with" LMC's byproduct materials license.  If they were, and LMC can demonstrate this at trial — or on summary judgment if there is no dispute about the nature and scope of the release or the scope of LMC's license—then LMC is entitled to judgment as a matter of law on this exception.  At this stage, however, there are factual questions which preclude ruling in LMC's favor on the validity of this exception.

### 6.  Summary of CERCLA Conclusions

In Part III.A.1, above, the court concluded that CERCLA cost recovery actions are permitted for the clean-up of NRC decommissioned sites so long as the actions otherwise meet all of the requirements for cost recovery imposed by CERCLA.  In Parts III.A.2 and 3, above, the court concluded that disposal of Sr-90 can indeed constitute a "disposal of any hazardous substance" for purposes of CERCLA liability pursuant to 42 U.S.C. § 9607(a)(2), and that PADEP adequately alleged that LMC "disposed" of Sr-90 during its operation of the site.  In Part

III.A.4, above, the court concluded that it could not determine at this stage of the proceedings whether the "release" exemption found in 42 U.S.C. § 9601(22) applied to the release of Sr-90 at the site because there is a factual dispute as to whether the contract between LMC and the Commission required financial protection—a provision that the Commission could have insisted upon in the agreement pursuant to the language of § 2210(d).  Finally, in Part III.A.5, above, the court concluded that it could not determine at this stage of the proceedings—based solely on the amended complaint and the matters of public record—whether the release of Sr-90 at the site was "in compliance with" the byproduct materials license held by LMC, and thus, subject to the exclusion of CERCLA liability for "federally permitted releases."  For all of these reasons, the court will deny LMC's motion to dismiss PADEP's CERCLA claims.

**B.**    <u>**State Law Claims**</u>

In addition to federal claims under CERCLA, PADEP seeks to recover its response costs for remedying the Sr-90 contamination under a host of state statutory and common law claims.  Specifically, PADEP seeks to recover under the Hazardous Sites Cleanup Act ("HSCA"), 35 P.S. §§ 6020.101-6020.1305; the Solid Waste Management Act ("SWMA"), 35 P.S. §§ 6018.101-6018.1003; the Clean Streams Law ("CSL"), 35 P.S. §§ 691.1-691.1001; and under a theory of common law nuisance pursuant to Section 1917-A of the Administrative Code of 1929, 71 P.S. § 510-17.  LMC argues that each of these claims is preempted by the Atomic Energy Act's pervasive federal licensing scheme controlling the use and disposal of radioactive materials.

"It is well established that within Constitutional limits Congress may preempt state authority by so stating in express terms." *See Pac. Gas and Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203 (1983) (citations omitted).  Here, there is no express preemption language contained in the AEA.  Absent express preemption, there can be implied preemption where the "scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room to supplement it," or, in the absence of complete displacement of state regulation, state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 204 (citations omitted).  Put another way, the test for whether a specific state cause of action is preempted "is whether 'the matter on which the state asserts the right to act is in any way regulated by the federal government.'" *Id.* at 213 (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 236 (1947)).

### 1.  Supreme Court Cases

Since the enactment of the AEA in 1959, the Supreme Court has addressed its pre-emptive effect in three decisions: *Pacific Gas*, *supra*; *Silkwood v. Kerr-McGee*, 464 U.S. 238 (1984); and *English v. Gen. Elec. Co.*, 496 U.S. 72 (1990).

In *Pacific Gas*, utility companies brought suit against the State of California to enjoin the enforcement of a state statute that imposed a moratorium on the construction of new nuclear power plants in the state until adequate storage and disposal methods became available for nuclear waste.  The Supreme Court held the Atomic Energy Act preempted the field in terms of the "radiological safety aspects involved in the construction and operation of [nuclear facilities]." *Id.* at 205.

However, the Court stated that the AEA's preemption of state law was limited: "[T]he federal government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the states." *Id.* at 212. Those powers ceded to the states include those ceded by the Commission under the Price-Anderson Amendments, the regulation of radioactive air pollutants pursuant to the Clean Air Act amendments, and certain siting and land use requirements for nuclear plants. *See id.*, at 212-13 n. 25.

Ultimately, the Court determined that Congress intended for the states to continue to make economic decisions. The Court determined that the "avowed" purpose of the California statute was economic in nature, this it was not within the preempted field, and that "the states retained the power to determine whether it made economic sense to build a nuclear power plant." *Missouri v. Westinghouse Elec., LLC*, 487 F. Supp. 2d 1076, 1084 (E.D. Mo. 2007) (citing *Pac. Gas.,* 461 U.S. at 223).

In *Silkwood*, 464 U.S. 238, the Supreme Court addressed whether punitive damages could be awarded in a tort action for injuries caused by radiological contamination at a NRC licensed nuclear facility. The Court examined the legislative history of the AEA, and found "ample evidence that Congress had no intention of forbidding the states from providing [remedies for those suffering injuries from radiological exposure]." *Id.* at 251. Ultimately, the Court decided that state punitive damages awards were not preempted, and explained as follows:

> [I]t is clear that in enacting and amending the [AEA], Congress assumed that state-law remedies, in whatever form they might take, were available to those injured by nuclear incidents. This was so even though it was well aware of the NRC's exclusive authority to regulate safety matters. No doubt there is tension between the conclusion

35

that safety regulation is the exclusive concern of the federal law and the conclusion that a state may nevertheless award damages based on its own law of liability. But as we understand what was done over the years in the legislation concerning nuclear energy, Congress intended to stand by both concepts and to tolerate whatever tension there was between them. We can do no less. **It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept.**

We do not suggest that there could never be an instance in which the federal law would preempt the recovery of damages based on state law. But insofar as damages for radiation injuries are concerned, preemption should not be judged on the basis that the federal government has so completely occupied the field of safety that state remedies are foreclosed but on **whether there is an irreconcilable conflict between the federal and state standards or whether the imposition of a state standard in a damages action would frustrate the objectives of the federal law.** We perceive no such conflict or frustration in the circumstances of this case.

*Id.* at 256 (emphasis added).

The third Supreme Court case to address this issue was *English v. General Elec. Co.,* 496 U.S. 72 (1990). In that case, an employee of a nuclear-fuel production facility brought suit against her employer, claiming that the employer took retaliatory action after she made nuclear safety complaints. The question before the court was whether federal law preempted a state cause of action for intentional infliction of emotional distress. The Court held that the state law claim did "not fall within the pre-empted field of nuclear safety," *id.* at 90, and did not conflict with the provision of the AEA that encouraged employees to report safety violations and established a procedure to protect them from any resulting retaliation.

36

*Id.* at 82.  In so doing, the Court found that "not every state law that in some remote way may affect the nuclear safety decisions made by those who build and run nuclear facilities can be said to fall within the pre-empted field." *Id.* at 79.  Instead, for a state law to be pre-empted, "it must have some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels." *Id.*

To summarize, the Supreme Court has unequivocally stated that the federal government occupies the field of nuclear safety entirely, and this field preemption is all encompassing where that state statute at issue involves nuclear safety.  In other words, if a state statute "was enacted with the purpose of protecting against radiation hazards, or if state regulation directly affected radiological safety regardless of the regulation's purposes" it is preempted. *Missouri v. Westinghouse Elec., LLC,* 487 F.Supp.2d 1076, 1085 (E.D. Mo. 2007) (citing *English*, 496 at 79.) However, where nuclear safety is not directly affected by the state statute, it is preempted only if "there is an irreconcilable conflict between the federal and state standards or whether the imposition of a state standard in a damages action would frustrate the objectives of the federal law," *Silkwood*, 464 U.S. at 256, or where there is "some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels." *English*, 496 U.S. at 79.

Thus, the question in this case is whether the state claims brought by PADEP directly involve nuclear safety concerns, if so they are preempted.  If they do not, then the court must determine whether they bear a direct and substantial

effect on the decisions made by those who run nuclear facilities and/or whether there are irreconcilable conflicts between them and the AEA.

## 2.  **PADEP's state law claims**

LMC argues that each of the Pennsylvania state law claims infringe upon the preempted field of nuclear safety, and it cites to the declaration of policy with respect to each statute.  It is true that each of the state statutes upon which PADEP's claims rest appear to have been enacted to address public health and welfare.  *See* 35 P.S. § 6020.102(2), (5) (stating that the HSCA (Count II) was intended to address contaminated sites that "pose a real and substantial threat to the public health and welfare."); 35 P.S. § 6018,102(4) (stating that the purpose of SWMA (Count III) was "to . . . protect the public health, safety and welfare from the short and long term dangers of transportation, processing, treatment, storage, and disposal of all wastes."); and 35 P.S. § 691.4(3) (stating that it was the object of the Clean Streams Law (Count IV) to "prevent further pollution of the waters of the Commonwealth . . . [and] . . . to restore to a clean, unpolluted condition every stream in Pennsylvania that is presently polluted[.]").

LMC argues that the state laws in question are analogous to those that the state of Missouri sought to enforce in *Missouri v. Westinghouse Elec., LLC,* 487 F. Supp. 2d. 1076 (E.D.Mo. 2007).  That case involved the cleanup of environmental contamination at the Hematite Nuclear Facility that was owned by Westinghouse. *Id.* at 1078.  The Hematite site had operated as a nuclear fuel processing plant for almost forty years, and was contaminated with radiological and chemical wastes.  In 2000, shortly after it acquired the site, Westinghouse began to decommission the facility under the supervision of the NRC.  *Id.*

The state of Missouri filed suit under section 107 of CERCLA, the Missouri Hazardous Waste Management Law, and the Missouri Clean Water Law. *See id.* In the complaint, Missouri sought injunctive relief, requiring that Westinghouse perform a Remedial Investigation/Feasibility Study (RI/FS) to determine the nature and extent of the contamination and develop a plan to decontaminate the area. *Id.* Missouri also demanded that Westinghouse implement the remedy selected through the RI/FS process and reimburse the state for past or future response costs incurred at the site. *Id.* In May of 2006, Missouri and Westinghouse entered into a Consent Decree and submitted it to the district court for approval. The Consent Decree sought reimbursement for all response costs, but also required Westinghouse to remediate the site under the supervision of the Missouri Department of Natural Resources ("MDNR"), which would have been given the authority to "halt, conduct or direct any action required by [the] Consent Decree, or to direct any other response action undertaken by MDNR or [Westinghouse] at the Site." *Id.* at 1080 (internal citations omitted). The United States and other corporate entities intervened in the case, and objected to approval of the Consent Decree because Missouri sought "to regulate the safety of radiological materials." *Id.*

The district court first concluded that the Consent Decree was unenforceable under section 107 of CERCLA because that section only permits a state to recover the costs incurred in remedial action, it does not give the state the authority to engage in or compel a responsible party to take any specific remedial action. *Id.* at 1081. Only the President of the United States, pursuant to sections 104 and 106 of CERCLA, is given the authority to take necessary action to control the release and decontamination of a polluted area, including the power to permit a

responsible private party to conduct an RI/FS. *Id.* Thus, the district court concluded that there was no federal basis for Missouri's regulatory action, and the Consent Decree was salvageable only if state law provided such authority.

After a thorough analysis of the Supreme Court's preemption cases, the district court concluded that the Consent Decree was "an attempt tp regulate the safety of nuclear contaminants," and that it was therefore preempted by the AEA "[u]nder the test espoused in *Pacific Gas*." *Id.* at 1085. The district court rested its determination on the fact that the Consent Decree "squarely addresses the State's health and safety concerns from radiological contamination." *Id.* at 1088.

The court finds *Westinghouse* distinguishable. Unlike the Consent Decree in *Westinghouse*, the state statutes at issue in this case, despite their broad statements of policy, do not directly involve nuclear safety concerns. While the purpose of the state statutes in question bear generally on the issue of public safety, they do not address the use, disposal, or manner of remediation of radiological waste, and do not impose additional burdens upon radiological safety than those already imposed by the AEA. The AEA "does not impair [s]tate authority to regulate activities of [NRC] licensees for the manifold health, safety, and economic purposes other than radiation protection." *N. States Power Co. v. State of Minn.*, 447 F.2d 1143, 1151 (8th Cir. 1971) (citing Sen. Rep. No. 870 (1959), *reprinted in* 1959 U.S.C.C.A.N. 2872, 2882-83 (stating that Section 274(k) [42 U.S.C. § 2021(k)] shall not be "construed to affect the authority of any sate or local agency to regulate activities for purposes other than protection against radiation hazards . . . [the AEA] does not impair the state authority to regulate activities of [NRC] licensees for the manifold health, safety , and economic purposes other than

radiation protection")).  Even a cursory review of the state statutes in question reveals that they are directed at safety concerns generally, and not at radiological safety, and, thus, are not covered by the AEA's field preemption.  Here, unlike the State of Missouri in *Westinghouse*, PADEP is not seeking to monitor, control, impose remediation standards or otherwise dictate how the site is remediated; rather, it only seeks reimbursement for the costs incurred in performing a federally-required clean up.  This clean-up was conducted under the authority of the NRC through its decommissioning process, not pursuant to any of the statutes in question.

Since nuclear safety is not directly affected by the state statutes in question, they are preempted only if "there is an irreconcilable conflict between the federal and state standards or whether the imposition of a state standard in a damages action would frustrate the objectives of the federal law," *Silkwood*, 464 U.S. at 256, or where there is "some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels." *English*, 496 U.S. at 79.  The court does not believe that either of these bases for preemption are applicable here.

First, PADEP is not seeking to enforce any state standards on the remediation of the site.  As stated previously, and as is averred in the Amended Complaint, the site was remediated pursuant to an NRC authorized decommissioning.  (*See* Doc. 3, Amend. Compl. ¶ 15.)  The AEA is silent on the issue of cost recovery, and this action was brought simply for the recovery of those costs incurred for the remediation.  The authority to recoup the costs comes from CERCLA, as well as each of the state causes of action asserted by PADEP.  Nothing

in the statutes themselves or in the nature of the causes of action brought by PADEP posses an irreconcilable conflict that would frustrate the objectives of federal law.

Second, the court does not believe that allowing the state causes of action to proceed would cause a direct or substantial effect on the decisions made by LMC or others who operate nuclear facilities concerning radiological safety levels. This case is about reimbursement of money spent, not the regulation of radiological hazards.  The Supreme Count in *Silkwood* acknowledged "a tension between the conclusion that safety regulation is the exclusive concern of federal law and the conclusion that a state may nevertheless award damages based on its own law of liability," but ultimately concluded that "Congress intended to stand by both concepts and . . . tolerate whatever tension there was between them."  *Silkwood*, 464 U.S. at 256.   The Court concluded that "[i]t may be that the award of damages based on [state law] is regulatory in the sense that a nuclear [facility] will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept."  *Id.*  Since the court perceives no conflict with or frustration of the objectives of the AEA by permitting PADEP's state causes of action to proceed, the court concludes that these causes of action are not preempted.

**IV.**        <u>**Conclusion**</u>

        For the reasons listed above, PADEP's CERCLA action is well pled and permissible notwithstanding the fact that the site was decommissioned pursuant to NRC authority.  Moreover, the court finds that PADEP's state law causes of action are not preempted by the Atomic Energy Act.  Accordingly, the court will deny Defendant LMC's motion to dismiss and will issue an order consistent with this memorandum.

                                        <u>s/Sylvia H. Rambo</u>
                                    United States District Judge

Dated:  February 1, 2010.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF ENVIRONMENTAL PROTECTION,** | : : : : : | **CIVIL NO. 1:09-CV-0821** |
| **Plaintiff** | : | |
| **v.** | : : | **JUDGE SYLVIA H. RAMBO** |
| **LOCKHEED MARTIN CORPORATION,** | : : : | |
| **Defendant** | : | |

# O R D E R

In accordance with the attached memorandum of law, **IT IS HEREBY ORDERED THAT** Defendant Lockheed Martin Corporation's motion to dismiss Plaintiff's amended complaint, (Doc. 16), is **DENIED**. The clerk of court shall issue a notice setting deadlines for a joint case management plan, and scheduling a case management conference.

s/Sylvia H. Rambo
United States District Judge

Dated:  February 1, 2010.