IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF ENVIRONMENTAL PROTECTION,** | : | |
| | : | |
| | : | |
| | : | |
| | : | **Civil No. 1:09-CV-0821** |
|       **Plaintiff and** | : | |
|       **Counterclaim** | : | |
|       **Defendant** | : | |
| | : | |
|   **v.** | : | |
| | : | |
| **LOCKHEED MARTIN CORPORATION,** | : | |
| | : | |
| | : | |
|       **Defendant and** | : | |
|       **Counterclaim** | : | |
|       **Plaintiff and** | : | |
|       **Third-Party** | : | |
|       **Plaintiff** | : | |
| | : | |
|   **v.** | : | |
| | : | |
| **THE UNITED STATES OF AMERICA,** | : | |
| | : | **Judge Sylvia H. Rambo** |
|       **Third-Party** | : | |
|       **Defendant** | : | |

**M E M O R A N D U M**

      In this action for "equitable contribution" for unreimbursed remediation expenditures incurred by Plaintiff related to the cleanup of a hazardous substance at the Quehanna Wild Area Nuclear Site, Third-Party Defendant has moved for summary judgment on the grounds that a settlement agreement between itself and Plaintiff affords it protection from contribution claims brought by Third-Party Plaintiff pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act.  The principal issue raised in the instant motion is whether a

settlement agreement between the plaintiff-state and a potentially responsible third-party defendant that was neither judicially approved nor subject to administrative review operates to bar the original potentially responsible defendant's Section 113(f)(1) contribution claim.  For the following reasons, the court holds that such an agreement does not conclusively afford the third-party defendant protection from any claim for contribution under Section 113(f)(1) when the proper response costs allocation method remains to be determined and will, therefore, deny the instant motion for summary judgment.

I.      **Background**

       The background surrounding the Quehanna Wild Area Nuclear Site, including the ownership and the use of radioactive material at the Site, was extensively recited by this court upon resolution of Lockheed Martin Corporation's motion to dismiss, *see Pennsylvania  v. Lockheed Martin Corp.*, 684 F. Supp. 2d 564 (M.D. Pa. 2010), and by the Third Circuit Court of Appeals, *see* 681 F.3d 503 (3d Cir. 2012).  Thus, for the purposes of resolving the instant motion, the court believes that the following factual recitation is sufficient to place the matter into context.

       a.      **Facts**

       This action arises out of response costs incurred by the Pennsylvania Department of Environmental Protection ("PADEP") in its cleanup of Strontium-90 ("Sr-90"), a radioactive isotope and hazardous nuclear byproduct material, from the Quehanna Wild Area Nuclear Site in the Quehanna Wild Area of the Moshannon State Forest in Clearfield County, Pennsylvania ("Site").  The predecessor of

Defendant Lockheed Martin Corporation ("LMC"), Martin-Marietta Corporation, was the last known user of Sr-90 at the Site.

The Site was constructed in 1957 by the Commonwealth of Pennsylvania ("Commonwealth") for the purpose of creating a research facility. From 1962 through 1967, the Site was leased by Martin-Marietta Corporation from the Pennsylvania State University, to conduct work at the Site involving Sr-90 for the United States Atomic Energy Commission ("AEC"), the predecessor agency to the Nuclear Regulatory Commission ("NRC").[1]  (Doc. 98, p. 3 of 13.)  Sr-90 was present at the Site when Pennsylvania State University obtained a byproduct materials license for Sr-90 after LMC ceased operations at the Site in 1967.  (Doc. 98, ¶¶ 4, 5.)

In the 1990s, the NRC ordered the Commonwealth, PADEP, and the Pennsylvania Department of Conservation and Natural Resources to decommission the facility.  This process required removal of any residual Sr-90 as well as demolition of the facilities and monitoring and sampling.  As a result, PADEP and, by extension, the Commonwealth have incurred more than $35 million in out-of-pocket expenditures.[2]

---

[1]  On June 7, 1963, Martin-Marietta Corporation and the AEC entered into a contract for the "Strontium-90 Isotopic Fuel Program."  (*See* Doc. 88-2, Contract No. AT(30-1)-3062, hereinafter "DOE Contract.")  That contract contained a "Nuclear Hazards Indemnity" provision, which LMC argues operates to hold LMC harmless for claims by third parties arising from a nuclear incident.  The import of that clause is not relevant to the instant matter.

[2]  In the amended complaint, PADEP asserted that it had incurred in excess of $20 million in unreimbursed response costs related to the cleanup of Sr-90 contamination at the Site.  (Doc. 3, ¶ 20.) In its response to LMC's second set of interrogatories, PADEP averred that the Commonwealth's out-of-pocket expenditures were more than $35 million.  (Doc. 98-3, p. 2 of 17.)  Although the basis for this revised amount is unclear, the exact figure of the costs incurred is immaterial to the court's resolution of the instant motion.

PADEP initiated the underlying action against LMC to recover costs incurred in its remediation efforts pursuant to Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended 42 U.S.C. §§ 9601-9675 ("CERCLA"), as well as by certain state environmental statutes. LMC filed both a counterclaim, alleging that PADEP is liable under CERCLA as a past owner and operator of the Quehanna Facility,[3] and a third-party complaint against, *inter alia*, the United States, alleging that LMC is entitled to contribution from the United States pursuant to Section 113(f)(1) in the event LMC is held liable to PADEP under Section 107(a).[4] (*See* Doc. 32.)

Sometime between 2000 and 2003, the United States and PADEP commenced negotiations for the purposes of addressing the United States's liability for response costs at the Site. As a result of those negotiations, the United States and the Commonwealth entered into an Interim Agreement in 2003 (Doc. 98-1) and a Final Agreement in 2004 (Doc. 98-2). In the Interim Agreement, the United States, without admitting liability, agreed to pay to the Commonwealth $7 million for the purposes of reimbursing the Commonwealth for carrying out response actions at the Site. (Doc. 98-1, ¶ 2.1.) In the Final Agreement, the United States agreed to pay the Commonwealth an additional $3 million in return for a release and covenant not to sue, which provided as follows:

---

[3] A third-party complaint was also filed against the Commonwealth of Pennsylvania and the Pennsylvania Department of Conservation and Natural Resources. (Doc. 33.) That complaint was dismissed by order of court on June 30, 2010. (Doc. 57.)

[4] LMC's third-party claim against the United States is based, in part, upon an indemnification agreement contained in a government contract. *See generally Hatko Corp. v. W.R. Grace & Co. - Conn.*, 59 F.3d 400 (3d Cir. 1995) (holding that, under CERCLA, agreements to indemnify or hold harmless with respect to CERCLA liability are enforceable between contracting parties). This matter is not before this court. *See* 28 U.S.C. § 1491.

> The Commonwealth hereby forever releases, discharges, and
> covenants   and agrees not to assert (by way of the
> commencement of an action, the joinder of the United States
> in an existing action or in any other fashion) any and all
> claims, causes of action, suits or dem     ands of any kind
> whatsoever in law or in equ ity which it m ay have had, or
> hereafter have, including, but not lim ited to, claim s under
> CERCLA Sections 107 and 113, against the United States, for
> Covered Matters.

(Doc. 98-2, Final Agreement, ¶ 14.) The Commonwealth and the United States also

agreed that the payment operated to provide the United States with contribution

protection by including the following language:

> The parties acknowledge and agree that the paym ent to be
> made by the United States pursuant to this Agreem ent, and
> which the Commonwealth has agreed to accept, discharges
> the United States from any and all Covered Matters addressed
> in the Agreement. With reg ard to any claims for costs,
> damages or other claim s against the United States for
> Covered Matters under or addressed in this Agreem ent, the
> Parties agree that the United States is entitled to, as of the
> Effective Date of this Agr eement, contribution protection
> pursuant to CERCLA Section 113(f), 42 U.S.C. § 9613(f), the
> Uniform Comparative Fault Act, and any other applicable
> provision of federal or state law, whether by statute or
> common law, extinguishing the United States' liability under
> CERCLA to persons not party to this Agreem ent. Any rights
> the United States or the Commonwealth may have to obtain
> contribution or otherwise recover costs or dam ages from
> persons not party to this Agreement are preserved.

(*Id.* at ¶ 15.) Significantly, the agreement was not filed as a proposed consent decree

and public notice was not published.

####    b.    **Procedural History**

PADEP initiated this action on April 30, 2009 (Doc. 1), and filed an amended complaint on May 7, 2009, wherein it named LMC as the sole defendant, asserting, *inter alia*, a CERCLA Section 107(a) claim seeking to recover costs associated with PADEP's remediation of the Site (*see* Doc. 3). Following the court's denial of LMC's motion to dismiss, *see Pennsylvania v. Lockheed Martin Corp.*, 684 F. Supp. 2d 564 (M.D. Pa. 2010), and facing the threat of potential liability to PADEP, LMC filed a third-party complaint against the United States, asserting, *inter alia*, a CERCLA Section 113(f)(1) claim seeking contribution. (Doc. 32.) The United States answered the complaint on June 17, 2010 (Doc. 56), and the case was thereafter placed on a complex case management track (Doc. 78).

Although the period for discovery remains ongoing (*see* Doc. 121 (granting joint motion for extension of time and extending deadline for fact discovery to October 20, 2015)), the United States filed a motion for summary judgment on February 25, 2014 (Doc. 97; *see also* Doc. 98). On April 1, 2014, LMC filed a timely brief in opposition. (Doc. 104; *see also* Doc. 103 (granting LMC's motion for an extension of time).) On April 28, 2014, the United States filed a timely reply brief. (Doc. 110; *see also* Doc. 108 (granting the United States's motion for an extension of time).) On May 5, 2014, LMC filed an authorized surreply. (Doc. 113; *see also* Doc. 112.) On November 12, 2014, the court heard oral argument pursuant to the United States's unopposed request. (Doc. 117.)

The parties made their positions clear during oral argument. The United States contends that its potential liability for contribution costs was eliminated by virtue of the Final Agreement, which is a position supported by the Commonwealth.

LMC takes the opposite position, contending that the Final Agreement only impacts the rights of the parties to the agreement and, therefore, does not affect its ability to seek contribution from the United States.

## II.        Legal Standard

Summary judgment may only be granted where the moving party shows that there is no genuine dispute as to any material fact and that judgment as a matter of law is warranted.  Fed. R. Civ. P. 56(a).  Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor.  *Montville Twp. v. Woodmont Builders LLC*, 436 F. App'x 87, 89 n.4 (3d Cir. 2011) (citing *Kossler v. Crisanti*, 564 F.3d 181, 186 (3d Cir. 2009)).  There is no genuine issue for trial only when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III.       Discussion

Resolution of this motion requires the court to first determine whether the Final Agreement impacts LMC's Section 113(f)(1) contribution claim against the United States for purposes of the contribution protection provision contained in Section 113(f)(2).  The court must then determine whether the Final Agreement

impacts LMC's claim for contribution against the United States in light of PADEP's interrogatory response indicating that it only seeks to collect a sum from LMC that reflects LMC's fair share.

## A.    CERCLA

The court first turns to the statutory provisions.  Generally, CERCLA provides a financial scheme whereby persons responsible for generating, handling, brokering, and/or transporting hazardous materials are jointly and severally liable for treating or disposing of such materials.  *See New Jersey Tpk. Auth. v. PPG Indus., Inc.*, 197 F.3d 96, 104 (3d Cir. 1999).  CERCLA facilitates the achievement of Congress' goal to place the cleanup costs of the nation's hazardous waste sites on the polluter by permitting the United States[3] or a state to hold any party that is at least partially responsible for the presence of hazardous substances liable for the sites' cleanup costs.  *See* 42 U.S.C. § 9607(a).  These potentially responsible parties ("PRPs") are defined by CERCLA Section 107(a) as a person who falls within at least one of the following categories:

(1)    the owner and operator of a vessel or a facility,

(2)    any  person who at the tim   e of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3)    any person who by contract, agreement, or otherwise arranged for disposal or treatment or arranged with a transporter for transport for disposal or treatm ent, of hazardous  substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party

---

[3]  The EPA by delegation has the powers of the United States under CERCLA Section 107(a).  *See* Exec. Order No. 12580 § 2(g), 52 Fed. Reg. 2923 (Jan. 23, 1987).

> or entity and containing such hazardous substances , and
>
> (4)    any person who accepts or accepted any hazardous substances for transport to disposal or treatm ent facilities, incineration vessels or sites selected by such person.

42 U.S.C. § 9607(a)(1)-(4).  Due to the broad definition of a PRP, a party who is only marginally responsible for the presence of minimal hazardous substances at a site remains liable for the site's cleanup.  *See United States v. Atlantic Research Corp.*, 551 U.S. 128, 136 (2007).

As originally enacted in 1980, CERCLA did not expressly provide for contribution actions among PRPs.  However, with the passage of the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Congress amended CERCLA to include several provisions addressing the issue of contribution among PRPs and the effect of settlements on such claims.  *See* 42 U.S.C. § 9613(f). Relevant to the matter *sub judice*, Section 113(f)(1) permits a PRP to seek contribution from another PRP during or following a CERCLA suit brought against the original PRP and provides, in pertinent part, as follows:

> Any person m ay seek contri bution from any other person who is liable or potentially liable under Section 9607(a) of this title, during . . . any civ il action under . . . [S]ection 9607(a) . . . .  In resolving contribution claims, the court may allocate response costs am ong liable parties using such equitable factors as the court determines are appropriate.

42 U.S.C. § 9613(f)(1); *see also Atlantic Research*, 551 U.S. at 139 (explaining that "Section 113(f)(1) authorizes a contribution action to PRPs with common liability stemming from an action instituted under [CERCLA]").  The amendment further provides an incentive for PRPs to settle their potential liability with the government

by granting settling parties protection from contribution actions by other PRPs.  *See*

42 U.S.C. § 9613(f)(2).  Particularly relevant for purposes of the instant motion, the

amendment specifically provide that:

> A person who has resolved its liability to the United States or
> a State in an administrative or judicially approved settlement
> shall  not be liable for claim   s  for contribution regarding
> matters addressed in the settlement.  Such settlement does not
> discharge any of the other potentially liable persons unless its
> terms so provide, but it reduces the potential liability of the
> others by the amount of the settlement.

42 U.S.C. § 9613(f)(2).  Contribution is defined as "the tortfeasor's right to collect

from others responsible for the same tort after the tortfeasor has paid more than his

or her proportionate share, [with] the shares being determined as a percentage of

fault."  *Atlantic Research*, 551 U.S. at 138 (quoting <u>Black's Law Dictionary</u> 353 (8th

ed. 2004)).  Thus, under Section 113(f)(2), a PRP that has entered into an

administrative or judicially approved settlement with a state may not be held liable

for contribution to another PRP who has elected not to settle its CERCLA liability.

*See* 42 U.S.C. § 9613(f)(2).  However, CERCLA does not provide a blanket

exemption from further liability; rather, the immunity from contribution is only

available for matters addressed in the settlement.  *See United States v. Union Gas*

*Co.*, 743 F. Supp. 1144, 1152 (E.D. Pa. 1990).

### B.    <u>Statutory Contribution Bar</u>

It is clear, under the provisions of Section 113(f)(2), that contribution

claims against persons who have resolved their liability to the United States or a state

in an administrative or judicially approved settlement are barred if they arise from

matters addressed in the settlement.  The United States argues that LMC's Section

113(f)(1) claim is barred because it has entered into a settlement with the

Commonwealth that resolved its liability for remediation costs incurred by the state at the Site.  Initially, the court notes that the United States is a person, 42 U.S.C. § 9601(21) (defining "person" as including the "United States Government"), and that the settlement is, therefore, between a person and a state.  Furthermore, the Final Agreement covers "any and all past or future claims that were or could now or hereafter be asserted by the Commonwealth against the United States arising out of or in connection with any conditions at the Site, including . . . any and all claims that could be asserted by the Commonwealth under CERCLA . . . to recover certain costs it may incur in response to the release . . . of hazardous substances at the Site." (Doc. 98-2, ¶ 3.)  Thus, it appears LMC's contribution claim against the United States is for a matter addressed in the Final Agreement.

However, the scope of the Final Agreement is not the end of the court's contribution protection inquiry.  Significantly, the contribution protection provision of Section 113(f)(2) only provides immunity from further contribution claims when the party has resolved its CERCLA liability through "an administrative or judicially approved settlement."  42 U.S.C. § 9613(f)(2).  LMC argues that the Final Agreement fails to qualify as either an administrative settlement or judicially approved settlement.  The court agrees.

A judicially approved settlement is one that can take the form of a consent decree and results from the court's approval of a settlement that is "fair, reasonable, and consistent with CERCLA's goals."  *See United States v. SEPTA*, 235 F.3d 817, 823 (3d Cir. 2000) (citing *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 85 (1st Cir. 1990)).  Procedures used in a CERCLA administrative settlement are set forth in Section 122(i), which mandates that: (1) at least thirty days before a

settlement may become final, the head of the department or agency which has jurisdiction over the proposed settlement publish in the Federal Register notice of the proposed settlement; (2) for a thirty-day period beginning on the date of publication, an opportunity be provided to persons who are not parties to the proposed settlement to file written comments relating to the proposed settlement; and (3) the head of the department or agency consider any comments that have been submitted.  42 U.S.C. § 9622(i).  Although CERCLA's specific notice and comment procedures are arguably required only of the federal government, several courts have recognized that because due process concerns are also present when an administrative settlement is entered into with a state, a non-settling party should still be provided with notice and an opportunity to be heard when the action was commenced by a state.  *See American Special Risk Ins. Co. v. City of Centerline*, 180 F. Supp. 2d 903, 909-10 (E.D. Mich. 2001) (recognizing the need for notice and comment procedure concerning a state settlement); *CPC Int'l, Inc. v. Aerojet-Gen. Corp.*, 759 F. Supp. 1269, 1283 (W.D. Mich. 1991) (stating in dicta that a settlement entered under process devoid of any hearings or public comment is not an "administrative or judicially approved" settlement under Section 9613(f)(2)).

   The Final Agreement is neither an administrative settlement nor a judicially approved settlement within the meaning of Section 113(f)(2).  No administrative procedures, including any public comment period, were followed nor did any impartial arbiter determine that the settlement amount was fair and reasonable in light of the United States's potential liability.  The court holds that, notwithstanding the identity of the settling parties, if procedural safeguards similar to those set forth in Section 122(i) are not followed, a settlement cannot constitute a

Section 113(f)(2) administrative settlement resulting in a contribution action being statutorily barred. *See United States v. Moore*, 703 F. Supp. 455, 459 (E.D. Va. 1988). In the Final Agreement, the Commonwealth agreed to release the United States from potential liability for $10 million. This agreement, however, does not conclusively equate to the United States being only responsible for causing $10 million worth of response costs at the Site. Unlike a scenario where there is either an approved settlement that is subject to scrutiny by an agency head with the benefit of public comments or a judicially approved settlement which must be assessed to be fair and reasonable, the Final Agreement is simply a settlement between two parties that may or may not reflect the actual proportionate liability of the United States. The due process concerns that Section 122(i) aims to safeguard "are magnified when a PRP seeks to use an administrative settlement to extinguish another PRP's contribution rights." *General Time Corp. v. Bulk Materials, Inc.*, 826 F. Supp. 471, 476 (M.D. Ga. 1993). LMC, who was neither a party to the settlement nor able to comment thereon, should not be barred from seeking contribution from a PRP for the amount it may ultimately be adjudged jointly and severally liable to the Commonwealth pursuant to the Section 107 action.

Therefore, the court holds that, for a settlement with a state to constitute an administrative settlement for purposes of Section 113(f)(2)'s contribution bar, the procedures designed to ensure due process must be followed.[4] Despite its inclusion

---

[4] During oral argument, the United States pointed to several cases in support of its position that the Final Agreement is an administrative settlement that is entitled to a statutory contribution bar. The United States cited *Hobart Corp. v. Waste Management of Ohio, Inc.*, 758 F.3d 757 (6th Cir. 2014), for the proposition that an agreement between settling parties is an administrative settlement for purposes of Section 113(f)(2) so long as the agreement resolved the settling parties' liability. *Hobart* is materially distinguishable. The gravamen before the *Hobart* court was whether the plaintiffs'

(continued...)

(...continued)
contribution action against other PRPs was barred by the statute of limitations. In resolving that issue, the Sixth Circuit was tasked with determining whether the settlement agreement between the plaintiffs and the United States Environmental Protection Agency qualified as an administrative settlement for the purposes of Section 113(f)(3)(B). The Sixth Circuit held that an agreement is an "administrative settlement" under Section 113(f)(3)(B) if it "resolve[s] [the PRP's] liability to the United States or a State for some or all of a response action or for some or all of the costs of such action." *Hobart*, 758 F.3d at 768 (quoting 42 U.S.C. § 9613(f)(3)(B) and citing *ITT Indus. v. BorgWarner, Inc.*, 506 F.3d 452, 459 (6th Cir. 2007)). The court in *Hobart* pointed to four "aspects of the [settlement agreement] that indicate[d] that the parties intended for the [settlement agreement] to resolve [the plaintiffs'] liability with the government," namely that: (1) the settlement agreement stated that it resolved the plaintiffs' liability to the United States; (2) the settlement agreement stated that the plaintiffs would receive protection from contribution actions; (3) the parties titled the settlement agreement an "Administrative Settlement Agreement and Order on Consent; and (4) the settlement agreement contained a covenant not to sue or to take administrative action against the plaintiffs pursuant to Section 106 and 107(a) of CERCLA. *Id.* at 768.

While not identical, the Final Agreement has many of the same characteristics as those found in the *Hobart* settlement agreement, namely that the agreement resolved the liability of the contracting parties and stated that it provided contribution protection to the settling PRP. However, *Hobart* is nevertheless distinguishable. In *Hobart*, the settling PRP was not seeking to bar contribution actions raised by non-settling parties who were not parties to the agreement. Rather, the question was whether settling parties' agreement could be an administrative settlement such that it permitted a settling party to bring a Section 113(f)(3)(B) action. Here, the United States argues that the Final Agreement between itself and PADEP affirmatively extinguishes the contribution rights of LMC. Such a scenario was not before the *Hobart* court.

The additional cases cited by the United States are likewise distinguishable because, unlike here, procedures intended to ensure due process were followed. In *United States v. Hercules*, 961 F.2d 796, 798 (8th Cir. 1992), the United States and the Arkansas Department of Pollution Control and Ecology (ADPCE) entered into a proposed consent decree with certain private PRPs. Significantly, the proposed consent decree was entered by the court, over objection from a non-settling PRP, following publication of the proposed consent decree and invitation for the public's comment. *Id.*; *see also United States v. Vertac Chem. Corp.*, 756 F. Supp. 1215, 1217 (D. Ark. 1991). Indeed, the appeal in *Hercules* arose from the district court's approval of the proposed decree after finding it fair, reasonable, and consistent with CERCLA. *Hercules*, 961 F.2d at 798. Here, the court did not approve the Final Agreement and the court did not have occasion to consider any objections from LMC, as none had been solicited. Thus, *Hercules* presented a different scenario than is present in the instant matter.

Similarly, in *Trinity Industries v. Chicago Bridge and Iron Co.*, 735 F.3d 131 (3d Cir. 2013), Pennsylvania and the plaintiff-PRP entered into a consent order that resolved the settling plaintiff PRP's liability under state law but did not address its CERCLA liability. *Id.* at 133. The Third Circuit found that the consent order was nevertheless an administrative settlement for purposes of CERCLA and, therefore, concluded that the settling PRP was able to pursue a Section 113(f)(3)(B) claim against the non-settling defendant PRP. *Id.* at 138. Here, it is the non-settling PRP that commenced a contribution action against a settling PRP. Moreover, as highlighted by LMC, notice of the consent order was published in the <u>Pennsylvania Bulletin</u> and comments were solicited for sixty days. *See* 37 Pa. Bull. 63, 63-64 (Jan. 6, 2007) ("Proposed Consent Order and Agreement; *see also* 1 Pa. Code § 3.11 ("[T]he

(continued...)

of language to the contrary and notwithstanding that the Final Agreement was signed by officials of PADEP and the United States, the Final Agreement is not entitled to Section 113(f)(2)'s contribution bar because the settlement process was devoid of any procedures designed to safeguard due process concerns.  Accordingly, the United States's motion for summary judgment on this basis will be denied.

## C.    Common Law Contribution Bar

The United States next contends that, even if Section 113(f)(2) is inapplicable to bar a contribution action, PADEP's indication that it is only seeking LMC's fair share of remediation expenses otherwise bars any contribution action. The United States relies on the Final Agreement to represent that $10 million is the extent of its own liability, so the balance of the cost recovery falls on LMC's shoulders.[5]  (*See* Doc. 98, p. 9 of 13.)  Addressing this issue requires the court to determine, *inter alia*, whether a *pro tanto* contribution approach is appropriate.

CERCLA directs that "[a] person who has resolved its liability to the United States or a State *in an administrative or judicially approved settlement . . . .* reduces the potential liability of the others *by the amount of the settlement.*"  42 U.S.C. § 9613(f)(2) (emphasis added).  The plain language lends itself to no construction other than a dollar-for-dollar reduction of the aggregate liability, which

---

(...continued)
[Pennsylvania] Bulletin is the official gazette of the Commonwealth of Pennsylvania."); *HCF of Bradford Inc. v. Richman*, Civ. No. 05-cv-0505, 2005 WL 1154426, *1 (M.D. Pa. Apr. 29, 2005) (recognizing that the Pennsylvania Bulletin is the state version of the Federal Register).  The notice and comment procedure utilized in connection with the *Trinity Industries* consent order are entirely absent from the matter *sub judice*.

[5]  Less a $2.5 million reduction, representing the expenditures attributable to the use of Cobalt-60 by Atlantic Richfield Company and a $7.5 million deduction for any Commonwealth owner-operator share as well as any Commonwealth alleged over-expenditure, resulting in a $15 million share for LMC to assume. (*See* Doc. 98-3, p. 3 of 17.)

is an approach consistent with that embodied in the Uniform Contribution Among Tortfeasors Act ("UCATA"), 12 U.L.A. 194 (1996).  Under this "*pro tanto*" approach, the combined liability of the non-settling parties is reduced by the amount of any settlement regardless of the actual percentage of the total fault of the settling parties.

However, CERCLA provides no direction regarding how a settlement other than one that was administrative or judicially approved affects contribution liability of non-settling parties.  Rather, Section 113(f)(1) instructs courts to "allocate response costs among liable parties using such equitable factors as the court determines are appropriate," 42 U.S.C. § 9613(f)(1), thereby conferring broad discretion in the equitable apportionment of liability to the courts, *Action Mfg. Co. Inc. v. Simon Wrecking Co.*, 428 F. Supp. 2d 288, 328 (E.D. Pa. 2006).  In contrast to the *pro tanto* approach is the "*pro rata*" approach, which is embodied in the Uniform Comparative Fault Act ("UCFA"), UCFA § 6, 12 U.L.A. 126 (1996).  This approach calls for the reduction of the non-settling PRP's liability by the equitable share of the settling party's liability based on relative fault.  *See* UCFA § 2.  The application of this allocation method results in the combined liability of the non-settling parties being reduced by the percentage of total actual fault of the settling parties.  These two approaches, therefore, assign the risk of an inadequate partial settlement, *i.e.,* a settlement below the amount of actual damage attributable to the settling PRP, to different parties, with the non-settling PRPs bearing the risk under the *pro tanto* approach and the settling plaintiff bearing the risk under the proportionate share approach.

The United States argues that, under the terms of the Final Agreement, the potential liability of LMC as a nonsettlor is reduced by the amount of the settlement, *to wit*, $10 million.  This position presupposes that the court will apply a *pro tanto* allocation scheme consistent with direction of Section 113(f)(2).  However, the court has already determined that the Final Agreement does not qualify as an administrative or judicially approved settlement for purposes of Section 113(f)(2), and, therefore, the *pro tanto* approach is not mandated by CERCLA.  *See supra* Part III.B.  Moreover, based on the record now in existence, the court concludes that a mechanical application of the *pro tanto* approach would not be equitable.  At this juncture, the record does not establish that the payment provision in the Final Agreement accurately represents the amount of harm caused by the settling party. Indeed, applying a *pro tanto* approach here would be akin to accepting the Final Agreement as establishing that LMC caused the remaining balance of PADEP's remediation costs, without giving LMC an opportunity to present facts to the contrary, which puts the risk of an insufficient settlement on the shoulders of a party who did not have a chance to object.  Certainly, the court's acceptance in this regard would side-step due process–the exact concerns addressed by the inclusion of the qualifying "administrative or judicially approved settlement" language in Section 113(f)(2).

Without the *pro tanto* approach mandated by Section 113(f)(2), the court is directed to " allocate response costs among liable parties using such equitable factors as [it] determines are appropriate." 42 U.S.C. § 9613(f)(1).  Such a discretionary function cannot be fulfilled on a record that continues to be developed, especially when fact discovery is ongoing.  Indeed, to grant the United States the

relief it requests in the instant motion would be to allocate to the United States the responsibility for $10 million of the total response costs sought by the Commonwealth, leaving the responsibility for the balance of the Section 107 action to be carried by LMC.  Such a result is inappropriate at this time because the allocation method has not yet been addressed.[6]

The inequitable impact of applying a common law contribution bar at this juncture is further exemplified by the nature of PADEP's action against LMC. The instant action was commenced pursuant to Section 107 and sought to recover from LMC all unreimbursed remediation expenditures incurred during the decommissioning of the Site.  LMC, in turn, filed its third-party complaint against the United States under Section 113(f)(1) and sought recovery of, *inter alia*, the amount equitably allocable to the United States, alleged to be a fellow PRP, as to be proven at trial.

The United States relies heavily on the Commonwealth's representation that it seeks to recover from LMC no more than LMC's reasonable allocation of the Commonwealth's past total cleanup expenditures for the Site.  The United States argues that it is impossible for LMC to recover anything in a contribution action

_____

[6] During oral argument, the court proposed applying an allocation scheme wherein any recovery against LMC would be reduced by the greater of the United States's proportionate share of responsibility or by $10 million as contained in the Final Agreement.  This approach would combine the benefits of the UCFA and the UCATA approaches, wherein LMC would in no event be responsible for more than its equitable share.  If the settlement amount is less than the amount of the United States's equitable share, then LMC would pay only its equitable share.  If the settlement amount is greater than the United States's equitable share, then LMC would effectively pay a reduced portion and only pay the amount due to PADEP.  Although the court believes that such a scheme would guard against LMC being required to pay more than its fair share while ensuring PADEP does not receive double recovery, the parties did not express consent to the court's application of such a method.  Therefore, without a stipulation to the allocation method, the equitable factors still need to be considered for purposes of allocating response costs.

against the United States because contribution is only available to a PRP that is liable for more than its fair share of response costs.  The United States reasons that, because LMC will be only liable for response costs attributable to its own conduct, LMC cannot pay more than its fair share and cannot maintain a Section 113(f)(1) contribution action.

While the United States's position is logical and may reflect the outcome of this litigation, the record fails to demonstrate that the United States is entitled to judgment as a matter of law.  Notwithstanding the Commonwealth's representation that it only seeks recovery of LMC's fair share, this action was commenced pursuant to Section 107, which provides that LMC, as a PRP, may be *jointly and severally liable for all costs of remedial action* incurred by the Commonwealth.  LMC is, in turn, entitled to "blunt any inequitable distribution of costs" and to seek, under Section 113, contribution from another PRP for any amount paid in excess of its allocable costs as determined by the court using equitable factors.  *See Atlantic Research Corp.*, 551 U.S. at 140.  Without knowing either the fault attributable to each PRP or the amount of damages attributable to LMC, the court cannot conclusively determine whether LMC will be held jointly and severally liable for an amount in excess of its fair share.[7]  Accordingly, the United States is not

---

[7]  The cases cited by the United States for the proposition that courts have held that CERCLA contribution claims are barred under the common law even where Section 113(f)(2) does not apply are distinguishable.  (*See* Doc. 110, p. 2 of 15.)  In *Responsible Environmental Solutions Alliance v. Waste Management*, Civ. No. 3:04-cv-0013, 2011 WL 382617, *4 (S.D. Ohio Feb. 3, 2011), *Foamseal v. Dow Chemical*, 991 F. Supp. 883, 886-87 (E.D. Mich. 1998), *Stearns & Foster Bedding v. Franklin Holding*, 947 F. Supp. 790, 813 (D.N.J. 1996), *United States v. SCA Services of Indiana*, 827 F. Supp. 526, 533 (N.D. Ind. 1993), *United States v. Western Processing*, 756 F. Supp. 1424, 1429 (W.D. Wash. 1990), and *American Cyanamid v. King Industries*, 814 F. Supp. 215, 217 (D.R.I. 1993), the courts applied a contribution bar notwithstanding the inapplicability of Section 113(f)(2), finding that barring contribution was consistent with Section 113(f)(1)'s direction to consider equitable factors

(continued...)

entitled to judgment as a matter of law on LMC's contribution claim based on the record before the court.

## IV.        Conclusion

The Final Agreement is not entitled to a statutory contribution bar because it is neither an administrative nor judicially approved settlement for purposes of Section 113(f)(2).  Furthermore, because Section 113(f)(2) is inapplicable, Section 113(f)(1) gives the court authority to allocate response costs among liable parties by using such equitable factors as it deems appropriate. Because the equitable method for allocation remains at issue, it is not clear whether LMC may be jointly and severally liable under Section 107(a) for more than its share of remediation costs incurred by PADEP.  Thus, if judgment is granted in favor of the United States on LMC's properly asserted Section 113(f)(1) contribution claim and it is ultimately determined that LMC is a responsible party for purposes of Section 107(a), LMC will be unable to reduce its liability through Section 113(f)(1)

---

(...continued)
when allocating costs.   In those cases, however, the court barred contribution claims only after it approved the proposed settlements.  Here, the settlement agreement between the PADEP and the United States was never before the court for approval, and the court never had the opportunity to conclude whether the terms thereof were "fair, reasonable and adequate" and "consistent with the purposes that CERCLA is intended to serve."   Additionally, in several cases cited by the United States, the court concluded that the proportionate share approach embodied in the UCFA was applicable to reduce the non-settling defendant's liability.  *See, e.g.*, *Barton Solvents, Inc. v. Southwest Petro-Chem, Inc.*, 834 F. Supp. 342, 349 (D. Kan 1993); *SCA Servs.*, 827 F. Supp. at 535-36; *American Cyanamid*, 814 F. Supp. at 218.  Here, the issue of equitable allocation of liability is not an issue before the court.  Indeed, it appears the United States may take the position that the PADEP's claim against LMC should be reduced by the amount of the settlement (*see* Doc. 98, p. 9 of 13) and at least recognizes that the allocation method "remains to be determined" (*see* Doc. 110, p. 7 of 15).  Without a statutorily mandated allocation method, the court is left to "allocate response costs among liable parties using such equitable factors as the court determines are appropriate."  42 U.S.C. § 9613(f)(1).  Without an adequately developed record, the court cannot engage in such an assessment.

allocation.  Accordingly, because PADEP's Section 107 claim seeks to hold LMC jointly and severally liable for all remediation costs incurred for cleanup of the Site, the record does not establish that the United States is entitled to judgment as a matter of law.  Therefore, the court will deny the motion for summary judgment without prejudice to the United States's right to seek summary judgment once an appropriate allocation method is established.

s/Sylvia H. Rambo
United States District Judge

Dated:  January 30, 2015.